IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KAYDENCE E.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KAYDENCE E., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

RICHARD E., APPELLANT, AND MAKALA F., APPELLEE.


Filed September 13, 2022.    No. A-22-117.


Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

William E. Madelung, of Madelung Law Office, P.C., L.L.O., for appellant.

Travis R. Rodak, Deputy Scotts Bluff County Attorney, for appellee State of Nebraska.


MOORE, RIEDMANN, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Richard E. appeals the order of the county court for Scotts Bluff County, sitting as a juvenile court, which terminated his parental rights to his minor child. Upon our de novo review of the record, we find sufficient evidence establishing statutory grounds for termination and that termination is in the best interests of the child. We therefore affirm the juvenile court's order.

## BACKGROUND

Richard is the father of Kaydence E., born in October 2017. The family came to the attention of the Nebraska Department of Health and Human Services (DHHS) in October 2020 upon a report of domestic violence between Richard and Kaydence's mother while Kaydence was present, concerns that Richard was using methamphetamine in the home while Kaydence was

present, and Richard having a significant history with DHHS and criminal court. More specifically, the report indicated that Richard punched Kaydence's mother in the face, causing a black eye. An investigation also revealed that Kaydence had a split lip and missing tooth at the time, and DHHS determined that the explanation given did not match the injuries.

Kaydence was removed from the home on October 1, 2020, and placed in foster care. That day, the State filed a petition alleging that she was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and an ex parte motion for temporary custody, which the juvenile court granted. Shortly thereafter, the State filed an amended petition alleging that Kaydence was at risk of harm because Richard uses controlled substances, assaults Kaydence's mother, and fails to place Kaydence's needs ahead of his own wants. The amended petition further alleged that Kaydence was at risk of harm because her mother, through no fault of her own, is habitually assaulted by Richard. Kaydence's mother entered an admission to the allegations at the adjudication hearing in November, and Kaydence was adjudicated under § 43-247(3)(a).

On October 6, 2020, Richard was sentenced in the district court on charges of possession of a firearm by a prohibited person and resisting arrest. He received a mandatory minimum sentence of 3 years' imprisonment up to a maximum of 3 years. Therefore, Richard was incarcerated throughout the duration of the case and was not part of the juvenile case, and thus, DHHS did not develop a case plan for him or offer him any services. Because he was incarcerated, he was unable to have visits with Kaydence, and the correctional facility where he was housed would not allow video calls. Although a DHHS worker intended to visit Richard on a monthly basis, due to scheduling concerns or issues at the correctional center, no visits actually occurred and it does not appear that DHHS ever made contact with Richard other than sending him one letter.

Early in the case, Richard would call Kaydence's mother when she had visitation with Kaydence so he could talk to Kaydence on the phone. After it appeared that Kaydence's behaviors were negatively affected by talking to Richard, however, DHHS recommended that he no longer call, and thus, he last had any contact with Kaydence in June 2021.

In September 2021, the State filed a motion to terminate Richard's parental rights to Kaydence. The motion alleged that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(1) and (2) (Reissue 2016) and that termination was in Kaydence's best interests. The State was also seeking to terminate the parental rights of Kaydence's mother, and the majority of the evidence presented at the termination hearing related to her. Because she is not at issue in this appeal, we summarize any evidence as to her only as it relates to Richard.

At the time Kaydence was removed from the home, she was developmentally delayed and behind on her speech, and she exhibited concerning behaviors, notably self-harming behaviors. In January 2021, she began receiving speech therapy and special education services. She worked on skills such as counting, colors, shapes, identifying feelings, and calming herself down when she was upset. Since she began receiving these services, she has "definitely" shown improvement in the sense that she is much more verbal, she can name her feelings and talk with an adult if something is bothering her, and her cognitive skills have significantly improved as well.

To address the behavioral concerns, Kaydence also began attending counseling with a licensed independent mental health provider. At that time, she was exhibiting extreme behaviors including self-harming such as bending her fingers backwards, twisting her feet around, and

banging her head on the wall. Kaydence also showed signs that she had not established secure attachment with caregivers, had unmet needs for nurturing, came from an environment with no limits given to her, and had experienced trauma. Therefore, the therapist recommended that she participate in child-parent psychotherapy (CPP), which looks at the experience of a relationship, attachment, and connection as opposed to assessing whether the child has a bond with a particular caregiver. The goal of CPP is to treat the relationship that a child has with caregivers and to help address ruptures in relationships based on histories of trauma. And it provides a way for the child and caregiver to work through the trauma the child has experienced, which usually helps decrease the child's behaviors. Kaydence participated in CPP with her foster mother because she was Kaydence's most stable caregiver at the time.

The therapist explained at the termination hearing that there are three phases to CPP, and Kaydence had just begun the second phase. Kaydence has made progress in stabilizing her behaviors as well as in reacting to separation from a caregiver, organizing her play, responding to moments of nurturing, and gaining an awareness of rules in her foster home. The therapist also observed improvements in Kaydence's cognitive abilities, such as completing a simple shape puzzle, and in her speech. She opined, however, that Kaydence likely needs another 9 to 12 months to get to the final stage of CPP, along with some individual counseling which will be more appropriate as Kaydence gets older.

Richard attended the termination hearing via video from the correctional center, and he testified on his own behalf. He explained that his release date is in June 2023 and acknowledged that that is the earliest date he could potentially reunite with Kaydence. He completed a 6-month substance abuse program while he has been incarcerated and was going to begin a parenting class.

Richard testified that DHHS attempted to set up a visit with him, but the request was denied because of an error in the paperwork. Other than receiving one letter, he had no contact with DHHS throughout the case. And he had no way of personally making contact with Kaydence, particularly after DHHS asked him to stop calling Kaydence's mother during her visitation with Kaydence.

After the conclusion of the termination hearing, the juvenile court entered an order terminating Richard's parental rights to Kaydence. The court determined that clear and convincing evidence supported termination under both of the statutory grounds alleged in the motion. The court also found clear and convincing evidence that termination was in Kaydence's best interests. Richard timely appeals.

## ASSIGNMENTS OF ERROR

Richard assigns that the juvenile court erred in finding (1) sufficient evidence to prove statutory grounds for termination and (2) that terminating his parental rights was in the child's best interests.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Taeson D.*, 305 Neb. 279, 939 N.W.2d 832 (2020).

ANALYSIS

*Statutory Grounds for Termination.*

In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. See, § 43-292; *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra.*

In its order terminating Richard's parental rights to Kaydence, the juvenile court found that a basis for termination existed under § 43-292(1) and (2). Section 43-292(2) provides for termination when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.

Richard argues that although he was incarcerated throughout the entirety of the case, he was essentially ignored by DHHS and that no services were ever provided to him nor was he granted any contact with Kaydence. We agree that DHHS' efforts in this case as to Richard were minimal and that the caseworkers intended to maintain consistent contact with him but did not do so. However, the State is not required to provide an opportunity of rehabilitation before terminating parental rights, although the court may choose to do so. *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 386 N.W.2d 877 (1986). There is no right to an opportunity for rehabilitation prior to termination of parental rights, but when such an opportunity is granted, the party must comply with the plan and satisfactorily complete it. *Id.* Therefore, DHHS was not required to offer services or develop a case plan for Richard.

Further, a plan for rehabilitation is not a prerequisite or condition precedent to termination of parental rights. *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991). The juvenile court may terminate parental rights under the various grounds specified in subsections (1) through (5) of § 43-292 without providing the parent with a reasonable opportunity to rehabilitate himself or herself. *In re Interest of L.C., J.C., and E.C.*, 235 Neb. 703, 457 N.W.2d 274 (1990). It is only to terminate parental rights pursuant to subsection (6) of § 43-292 that the State is required to prove that the parents have been provided with a reasonable opportunity to rehabilitate themselves according to a court-ordered plan and have failed to do so. *In re Interest of L.C., J.C., and E.C., supra*. Because the State sought to terminate Richard's parental rights pursuant to § 43-292(1) and (2) in this case, it was permitted to do so without having offered him any rehabilitative services.

Even if DHHS had desired to offer services to Richard, it was limited in what it could provide for him due to his incarceration. See *In re Interest of Tabatha R.*, 255 Neb. 818, 587 N.W.2d 109 (1998) (extending reasoning that incarceration may be considered in determining whether to terminate parental rights to decision whether to adopt rehabilitation plan). The correctional facility where Richard was housed does not allow video calls, and phone calls with Kaydence, who was 3 years old at the time, were not likely to be productive in maintaining or improving the bond between father and daughter. Further, Kaydence's therapist advised that consistency and predictability are very important for her, and if she has repeated exposure to a parent that is intermittent or inconsistent, that is very stressful for her.

Moreover, Richard spoke on the phone with Kaydence early in the case while Kaydence was visiting with her mother, but according to DHHS, Kaydence's behaviors increased after having contact with Richard, and therefore, the caseworker recommended that they no longer have phone contact. Any other services that DHHS would generally provide to a parent such as substance abuse treatment, individual therapy, or assistance with housing and employment were not within DHHS' abilities while Richard was incarcerated. As such, DHHS was not required to offer services to Richard prior to seeking termination of his parental rights pursuant to subsections (1) and (2), and we find no error in its decision not to do so.

Turning to whether the State presented sufficient evidence to support termination under § 43-292(2), we agree with Richard that his incarceration alone does not provide a ground for termination of parental rights. See *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). However, a parent's incarceration may be considered along with other factors in determining whether parental rights can be terminated based on neglect. *Id.*

In *In re Interest of Kalie W., supra*, the Nebraska Supreme Court observed that the father's incarceration made it nearly impossible for him to provide for any of his child's needs. There the father, like Richard here, argued that he was not given the opportunity to meet his child's needs because he was denied visitation while imprisoned. But the Supreme Court recognized that a parent may as surely neglect a child of whom he or she does not have possession by failing to put himself or herself in a position to acquire possession as by not properly caring for a child of whom he or she does have possession. *Id.*

Further, the Supreme Court in *In re Interest of Kalie W., supra*, observed that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* Thus, the Supreme Court noted that the father could not complain that he did not have the opportunity to meet his child's needs when it was his own conduct that placed him in a position where he could not care for his child. And the Supreme Court reiterated that in termination of parental rights cases, it is proper to consider a parent's inability to perform his parental obligations because of imprisonment and the nature of the crime committed, among other factors. *Id.*

In the present case, 5 days after Kaydence was placed in the custody of DHHS, Richard was sentenced to a mandatory minimum of 3 years' imprisonment. The earliest he could be released is June 2023, which would leave Kaydence in foster care for at least 2 years and 8 months. Although his incarceration itself is involuntary, the actions that led to his incarceration were voluntary. Richard has previously been convicted of felony offenses, and thus, he is prohibited from possessing a weapon. Yet, in January 2020, apparently while under the influence of methamphetamine, he fired a gun toward other people and threatened someone, and then resisted when law enforcement attempted to arrest him, all of which led to initial charges of terroristic threats, use of a firearm to commit a felony, possession of a firearm by a prohibited person, and resisting arrest. Consequently, it was his own actions that led to his being incarcerated throughout the entirety of the case and prevented him from being in a position to care for Kaydence.

In addition to Richard's incarceration, there was other evidence supporting a finding that he neglected to give Kaydence necessary parental care and protection. He was violent toward Kaydence's mother in the presence of Kaydence, punching her in the face on one occasion and causing a black eye, and he was very controlling of her during their relationship. Kaydence also

had injuries for which Richard and Kaydence's mother could not provide a logical explanation. Richard was using methamphetamine, and there were reports that he was doing so in the home, while Kaydence was present. He also has a criminal history that includes previous felony convictions and crimes of violence such as domestic assault and third degree assault.

Furthermore, when Kaydence was removed from the home, she was developmentally delayed and behind on her speech, and she exhibited concerning behaviors, including self-harming behaviors. Kaydence also showed signs that she had not established secure attachment with caregivers, had unmet needs for nurturing, came from an environment with no limits given to her, and had experienced trauma.

The foregoing evidence establishes that Richard neglected to give Kaydence proper parental care and protection while she was living with him, and due to his criminal conduct, he will not be in a position to acquire possession of her until June 2023 at the earliest. Accordingly, we find that the evidence was sufficient to terminate Richard's parental rights under § 43-292(2). Because the State needed to prove only one basis for termination, and did so here, we need not further analyze Richard's argument related to § 43-292(1). See *In re Interest of Taeson D.*, 305 Neb. 279, 939 N.W.2d 832 (2020).

*Best Interests.*

Richard also assigns that the juvenile court erred in finding that terminating his parental rights was in the best interests of the child. We find no error in the court's decision.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Steven S. et al.*, 27 Neb. App. 831, 936 N.W.2d 762 (2019). A child's best interests are presumed to be served by having a relationship with his or her parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

As detailed above, at the time Kaydence was removed from Richard's home, she was developmentally delayed in her cognitive abilities and speech, and she exhibited concerning behaviors, including self-harming behaviors. Notably, the DHHS caseworker observed that speaking to Richard on the phone had a negative effect on Kaydence's behaviors. Kaydence also showed signs that she had been neglected in the home such that she had not established secure attachment with caregivers, had unmet needs for nurturing, came from an environment with no limits, and had experienced trauma.

After contact with Richard ceased and Kaydence began participating in counseling, speech therapy, and special education services, she showed improvement in all areas. She is now able to engage in tasks for longer periods of time, is more verbal and speaking more clearly, is able to name her feelings and talk to an adult if something is bothering her, and can identify colors and shapes and can count.

She has also shown behavioral progress in terms of using a secure base and feeling more securely connected to a caregiver. And she was making progress with socio-emotional skills such as accepting the word "no" after coming from an environment in her home where there were no limits given to her. The therapist explained that although Kaydence was 4 years old, she responded to hearing "no" as if she was 18 months or 2 years old, and that continuing to make progress in that area was particularly important as she prepares to enter kindergarten in the near future.

Not only was Kaydence's development impacted while living with Richard, but she was exposed to domestic violence and drug use. She has shown improvement in cognition, behavior, and addressing her trauma history since she was removed from the home. And because Richard will remain incarcerated until June 2023 at the earliest, he will not be in a position to provide any parental care for her in the near future. We therefore affirm the juvenile court's decision that Richard is unfit and that the child's best interests require termination of his parental rights.

## CONCLUSION

Upon our de novo review of the record, we find no error in the decision of the juvenile court. The court's order is therefore affirmed.

AFFIRMED.